UNITED STATES DISTRICT COURT <span style="text-decoration: underline;">FOR ONLINE PUBLICATION ONLY</span>
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
WENDELL M. LIGON,

         Plaintiff,        MEMORANDUM
                        <span style="text-decoration: underline;">AND ORDER</span>
    -against-           08-CV-1551 (JG) (MDG)

MICHAEL J. ASTRUE, Commissioner of
Social Security,

          Defendant.
--------------------------------------------------------------x
A P P E A R A N C ES:

    HERBERT S. FORSMITH
       26 Broadway, 17th Floor
       New York, NY 10004
       Attorney for Plaintiff

    BENTON J. CAMPBELL
       United States Attorney
       Eastern District of New York
       271 Cadman Plaza East
       Brooklyn, NY 11201
    By:  Edward K. Newman
       Attorney for Defendant

JOHN GLEESON, United States District Judge:

      Wendell M. Ligon sues Commissioner of Social Security Michael Astrue under

42 U.S.C. § 405(g), seeking review of Astrue's decision that he is not entitled to a period of

Supplemental Security Insurance ("SSI") benefits under Title XVI of the Social Security Act

("the Act"). The parties cross-move for judgment on the pleadings, the Commissioner seeking

affirmation of his final decision that Ligon is not disabled and therefore, not eligible for SSI

benefits, and Wendell seeking a reversal. For the reasons that follow, Ligon's motion is granted

to the extent that the case is remanded for further proceedings, and the Commissioner's motion is

denied.

A.        *Ligon's Claim of Disability*[1]

Wendell Mark Ligon was born in Tuskegee, Alabama on February 2, 1959, and is now nearly 50 years old. He went to woodworking vocational school after completing the ninth grade and worked for more than 20 consecutive years as a maintenance worker, parking coordinator and car transporter. While employed as a maintenance worker on October 28, 2003,[2] Ligon was struck by a moving vehicle as he was removing garbage. He fell to the ground, landed on his left side and sustained injuries to his back and left knee.

Ligon lives with his parents and brother. He does not take care of anyone else or any pets. Prior to his injuries he could exercise, work and engage in activities such as fishing and shooting pool. He is unable to participate in any of his former hobbies as a result of his injuries. His injuries prevent him from sleeping at night. He sometimes relies on the assistance of his father to get dressed or to shave his head and he usually relies on his mother to prepare his meals, although he prepares simple meals twice a week. He is unable to perform household chores or to drive. He uses public transportation to go to physical therapy. He is able to pay bills and manage his finances. His brother does the laundry and the grocery shopping, but Ligon sometimes accompanies him. Ligon speaks briefly to people on the phone approximately once a day but no longer visits with friends. The only places he regularly visits are the physical therapist's and doctors' offices.

---

[1]        The facts in this section are taken primarily from Ligon's responses to a Disability Report, R. 70-89, which he submitted on July 7, 2006 in connection with his application for SSI benefits, and his disability benefit eligibility hearing before Administrative Law Judge Neil Ross on November 26, 2007. R. 434-55.

[2]        The record is inconsistent with respect to the date of the accident, which is sometimes reported as October 27, 2003.

At the time of his application, Ligon stated that he could lift less than five pounds, stand and walk up to 10 minutes, climb stairs with difficulty and walk only one block before needing to stop to rest for five minutes. He must alternate between sitting and standing, cannot kneel or squat and feels pain when reaching. His hands tremble when he uses them and he uses a cane and brace when walking outside. Ligon has a "stabbing" pain in his back on a daily basis that radiates to his left knee. He testified that he takes Tylenol with codeine three times a day to control the pain, but the relief lasts only about two hours and often causes him to fall asleep. He has trouble paying attention but can complete a task once he starts it. He has anxiety around cars and sometimes has difficulty remembering things.

At the hearing on November 26, 2007, Ligon was experiencing the lower back pain. At the conclusion of the hearing he said that if he were home he would have had to get up and shift around to try to alleviate the pain. He testified that despite having had surgery on his left knee, he continues to experience pain in the knee that prevents him from sitting for too long. Ligon testified that he has difficulty sleeping at night due to pain, lies on his back on the floor for at least two to three hours each day to alleviate his lower back pain and often sleeps on the floor. He wakes up from pain at night and takes medication to fall back asleep. He is able to sit for up to one and one-half hours at a time for a total of three hours a day but he begins to feel pain after ten minutes. He can stand for about 45 minutes to one hour at a time for a total of one and one-half hours a day. He uses a cane prescribed by his doctor for support of his left knee as well as a back and knee brace. He stated that he is able to walk about four blocks before needing to stop and hold a pole because of pain in his lower back. He can climb and descend stairs, but only very slowly and with his cane, because sometimes he loses all feeling in his left leg. He said he

can lift 10-15 pounds but when asked about taking out the trash, he said that his back pain prevents him from lifting it.

Ligon's physical therapy and treatment with Dr. Gideon Hedrych ceased several months prior to the hearing, after he received a lump sum Workers' Compensation settlement and consequently had to pay for his own treatment. As of the hearing, he did not have a new treating physician. Despite testifying that he could not sit more than three hours a day, Ligon acknowledged after questioning by the ALJ that his symptoms should not prevent him from performing a security surveillance-type job that would allow him to alternate sitting and standing. However, Ligon also stated that he would not be able to take public transportation on a daily basis because of the pain in his lower back and knee.

B.    *Medical Evidence*

1.    *Dr. Neil Morgenstern and Dr. Dov Berkowitz*

Dr. Neil Morgenstern, a physiatrist, began treating Ligon on November 6, 2003, for complaints of lower back pain with radiation and numbness down his left lower extremity and left knee pain. R. 132. After an examination, he reported that Ligon's lumbar spine was remarkable for tenderness, reduced range of movement and/or positive straight leg raising. *Id*. Review of the left knee revealed positive joint line tenderness and motor strength remained constant at a grade 5/5, except for the left quadriceps and hamstrings, which were slightly lower (-5/5). R. 133. Sensory examination revealed hypoesthesia[3] on the left in the L5-S1 dermatomal region. Deep tendon reflexes were 2 and symmetrical. *Id*. Morgenstern's impression was that

_____

[3]    Hypoesthesia refers to "partial loss of sensitivity to sensory stimuli; diminished sensation." *The American Heritage Medical Dictionary* (2007), http://medical-dictionary.thefreedictionary.com/hypoesthesia.

Ligon suffered from lumbar spine myofascitis,[4] a possible lumbar herniation and a knee sprain. *Id.*

Morgenstern recommended a plan of physical therapy three times per week in conjunction with additional testing and expert consultations. *Id.* He also stated that Ligon was currently disabled from performing his job duties. Ligon saw Morgenstern approximately a dozen times between his initial consultation and February 24, 2005. R. 125-47. Throughout the course of treatment, Morgenstern reported that Ligon's pain was improving with therapy. R. 127, 129, 134, 136, 138, 140, 142, 144. A November 10, 2003 x-ray of the left knee revealed no abnormalities. R. 148.

Morgenstern referred Ligon to Dr. Dov Berkowitz, an orthopedic surgeon. Berkowitz performed an initial evaluation of Ligon on December 30, 2003, noting among other things that Ligon had a decreased range of motion with positive paraspinal spasm and tenderness, as well as decreased flexion and extension in his back. R. 110. Berkowitz prescribed Vioxx and recommended a magnetic resonance imaging ("MRI") of Ligon's lumbar spine and left knee. *Id.*

A January 20, 2004 MRI of Ligon's spine showed scoliosis, straightening of the lumbar lordosis, L2-3 and L5-S1 posterior disc bulges, and L3-4 and L4-5 posterior disc herniations with flattening of the ventral thecal sac. R. 149.

Berkowitz evaluated Ligon again after the MRI on April 22, 2004. R. 109. At that time Ligon reported that his back pain was improving with treatment but he continued to have left knee pain. *Id.* On examination, Ligon could extend his lower back within two degrees

---

[4]    Myofascitis refers to "inflammation of a muscle and its fascia." *Dorland's Medical Health Dictionary for Consumers* (2007), http://medical-dictionary.thefreedictionary.com/myofascitis.

of full extension and flex past 100 degrees, although it was painful. Ligon had no significant anteromedial or anterolateral tenderness, but he did have some posteromedial tenderness. Berkowitz requested authorization for an MRI of the left knee. *Id.*

2. *Dr. Jonathan Glassman*

On April 28, 2004, Dr. Jonathan Glassman performed an independent medical evaluation in connection with Ligon's Workers' Compensation claim. R. 339-41. Ligon reported that his ongoing physical therapy sessions were helpful for his lumbar spine condition. Glassman's examination of the lumbar spine and the left knee led him to diagnose Ligon with internal derangement of the left knee, revolved contusion of the left leg and resolving sprain of the lumbar spine with left sided radicular complaint. He also noted that Ligon walked with a cane, had an abnormal gait and could not walk toe-heel without difficulty. He found that arthroscopy of the left knee was reasonable and stated that Ligon had a mild disability and could return to light clerical or sedentary work. *Id*.

Glassman re-evaluated Ligon on June 30, 2004. R. 333-36. Ligon again reported that physical therapy was helping his lumbar spine. R. 333. Although Glassman noted that Ligon was using a cane, he indicated that Ligon did not need it when distracted. R. 333-34. After conducting his physical examination, including a panoply of tests, Glassman diagnosed Ligon with (1) resolved sprain of his lumbar spine without any radicular complaints or objective clinical findings on exam; (2) resolved contusion of his left leg; and (3) left knee posttraumatic patellofemoral syndrome with suspicion of internal derangement. R. 335. Glassman recommended orthopedic follow-up for the left knee and indicated that neither further physical therapy nor surgery was necessary. Similar to the first evaluation, Glassman also expressed his

opinion that Ligon had a mild disability and could return to work with limitations of not lifting or carrying greater than 30 pounds. *Id*. He also noted that "the injuries sustained and the accident reported [we]re causally related." R. 336.

A physical therapist performed range of motion testing on November 11, 2003 and June 25, 2004, which revealed a total spine range of motion impairment of 8-11% and a whole person impairment of 15-16%. R. 113-22.

3. *Ligon's Knee Surgery*

On August 20, 2004, Berkowitz performed arthroscopic surgery on Ligon's left knee for internal knee derangement. R. 152. The post-operative diagnosis was hypertrophic synovitis[5] and debris of the patellofermoral joint. *Id*. An August 26, 2004 letter from Berkowitz reporting Ligon's post-operative condition to Morgenstern indicated that Ligon's wounds showed no signs of infection but that he had reduced range of motion in all planes with swelling. Berkowitz advised physical rehabilitation as soon as possible. R. 107. A second letter from Berkowitz to Morgenstern followed on December 9, 2004, in which Berkowitz reported that examination of Ligon showed that he could extend his knee nearly fully and flex to about 90 degrees, and that there was no effusion or joint line tenderness. R. 106. Berkowitz recommended a brace for Ligon because he reported difficulty going up and down stairs and used a cane to do so because he felt that his knee might give out. *Id*.

On February 24, 2005, Ligon met with Morgenstern, complaining of left knee pain accompanied by buckling of the knee as well as low back pain radiating to his left leg. R.

---

[5] Hypertrophic synovitis refers to enlargement and inflammation of the synovium, a membrane found inside joints, *Gale Encyclopedia of* Medicine (2008), http://medical-dictionary.thefreedictionary.com/synovitis.

125. Morgenstern advised him to use a cane and the brace and to follow up with his orthopedist, Berkowitz, for his knee pain. *Id.* Morgenstern also discontinued Ligon's physical therapy, but explained that it should resume if the pain worsened. *Id.*

On May 11, 2005, Glassman evaluated Ligon for a third time. R. 311-14. Ligon complained of lower back pain, which occasionally radiated to his left knee. Ligon also stated that he had difficulty walking, required a cane when walking greater than five blocks and could not lift his 30-pound godson. R. 312. After examining Ligon's lumbar spine and left knee, Glassman noted that there was "no indication for further treatment from an orthopedic viewpoint," that further physical therapy was not necessary and that he was "at a loss" to understand the need for the hinged knee brace. R. 313. He concluded that Ligon had a "mild disability," noting that "[t]here is objective evidence of a need to limit work status and/or activities of daily living." *Id.* Glassman stated that Ligon was capable of working with the restriction that he not lift more than 30 pounds. *Id.*

In a follow-up appointment with Berkowitz on September 8, 2005, Ligon complained of continued lower back pain that radiated to his left leg as well as pain in his left knee. R. 105. Berkowitz noted that Ligon had good movement of his left knee, no significant tenderness, and decreased pain since surgery. *Id.* He also noted that Ligon would consult Dr. Breitstein for pain management. *Id.*

4. *Dr. Gautam Khakhar*

Dr. Gautam Khakhar, another physiatrist, examined Ligon on August 11, 2005. Ligon complained of continued low back and knee pain. R. 157-58. Physical examination revealed less than normal range of motion of his lumbar spine and tenderness, painful range of

motion and residual edema in his left knee. A straight leg raise test was positive on the left. R. 157. Sensory testing showed diminished sensation in his left L4-5 dermatomal distribution. R. 158. Khakhar's medical impression was that Ligon had a lumbar disc bulge, lumbar disc herniation and left knee derangement. *Id.* He recommended resuming weekly physical therapy, orthopedic follow-up for his left knee, consultation with a pain management specialist, over-the-counter pain medication, if necessary, and follow-up in four-to-six weeks. *Id.* In Khakhar's opinion, Ligon's disability status was "[p]artially incapacitated." *Id.*

Khakhar examined Ligon again on September 22, 2005, noting this time that Ligon's lumbar spine range of motion had increased slightly from 70 to 75 degrees but that the straight leg raise reproduced left-sided low back pain. R. 155-56. Examination of Ligon's left knee revealed a painful range of motion with diminished flexion, tenderness and residual edema. R. 155. Khakhar recommended continued physical therapy, a consult with a pain specialist, follow-up with the orthopedist and over-the-counter medication. R. 156.

5. *Dr. Robert Zaretsky*

On August 26, 2005, Dr. Robert Zaretsky, an orthopedic surgeon, examined Ligon in connection with his Workers' Compensation claim. R. 326-28. His report stated that Ligon reported pain when standing, walking, bending and lifting and that treatment, which he was no longer receiving, had not improved his condition. R. 326. After conducting a series of tests and reviewing Ligon's medical evaluations and reports, Zaretsky diagnosed Ligon with resolved herniated lumbar discs and post arthroscopic surgery of the left knee. R. 327. He noted a schedule loss of use of the left lower extremity of five percent and concluded that further treatment was "not reasonable, related or necessary." *Id.* After reviewing additional medical

9

records, Zaretsky submitted an addendum to his report on October 12, 2005, noting that his opinion of Ligon's condition was unchanged.  R. 323-24.

6. *Dr. Gideon Hedrych and His Referrals*

Dr. Gideon Hedrych, an Emergency Medicine and Trauma specialist, treated Ligon from March 6, 2006 until December 18, 2006.  R. 286-300, 304-310.  After conducting a comprehensive initial examination, Hedrych concluded that Ligon's disability was total.  R. 305. His initial diagnostic impressions, all of which he found to be causally related to injuries sustained on October 28, 2003, were (1) "dorsal spine sprain/strain with traumatic myofascitis, consider derangement, consider radiculopathy and/or myelopathy"; (2) lumbrosacral derangement with traumatic myofascitis; (3) lumbar radiculopathy; and (4) left knee derangement with traumatic tendinitis and probable torn meniscus.  R. 307.  He recommended x-rays of the spine and knee; an MRI of the thoracic spine and lumbrosacral spine to determine whether a herniated disc was causing the symptoms; an MRI of the left knee; an EMG/NCV[6] study of the lower extremities to detect radiculopathy; back and knee braces; rehabilitation medicine consultation with Dr. Blonder; a prescription for Tylenol No. 3; and follow-up in two weeks.  *Id.*

X-rays performed March 20, 2006 revealed mild lumbar scoliosis and a normal left knee.  R. 321.  Follow-up examinations on March 22 and April 12, 2006 revealed essentially unchanged findings and reiterated requests for additional diagnostic testing and MRIs.  R. 299-300, 309-10.

---

[6]     EMG refers to "[a] diagnostic test that records the electrical activity of muscles. In the test, small electrodes are placed on or in the skin; the patterns of electrical activity are projected on a screen or over a loudspeaker. This procedure is used to test for muscle disorders, including muscular dystrophy." *Gale Encyclopedia of Medicine* (2008), http://medical-dictionary.thefreedictionary.com/EMG.  NCV refers to a nerve conduction velocity study.

Hedrych referred Ligon to Dr. Ofra Blonder, a Physical Medicine and Rehabilitation Specialist, for a consultative examination, which was performed on April 20, 2006. R. 301-03. Blonder's physical examination revealed Ligon to have a slow, slightly antalgic gait and difficulty walking, limited range of motion, tenderness, spasm on palpitation of his lumbar spine, and tenderness and pain in his knee. *Id.* Blonder's impression was lumbrosacral spine derangement and left knee derangement, both of which he found to be causally related to injuries Ligon sustained on October 28, 2003. He recommended continued physical therapy with electrical stimulation, massage, hot packs, ultrasound and active exercises to the back and knee as well as follow-up in six weeks. R. 303.

Ligon had a follow-up appointment with Hedrych on June 21, 2006, in which the doctor's diagnoses and recommendations remained the same. R. 295-97. On July 10, 2006, Hedrych dictated a medical report summarizing his examinations of Ligon. R. 176-80. The results of his physical examination of Ligon remained essentially unchanged. Ligon continued to complain of upper and lower back pain, the latter of which radiated to the left lower extremity, with associated numbness, especially in the thigh. R. 177. In addition, Ligon had persistent knee pain when walking or weightbearing, which was exacerbated with buckling by ascending or descending steps. *Id.* Ligon also complained of persistent anxiety, nervousness and fear of being near cars in motion. R. 179. Hedrych also noted that Ligon was unable to (1) sit or stand for more than 45 minutes or walk more than eight blocks without experiencing pre-emptive lumbrosacral pain and left lower extremity radicular symptoms; (2) lift, carry, push or pull any significant weight; or (3) bend, stoop or crouch. R. 170-80. Hedrych found that Ligon was "totally disabled" and "unable to do any job currently available to him in the market place." R.

11

180.  Hedrych's reports of Ligon's August 23, 2006, October 4, 2006 and December 18, 2006 examinations showed little change of condition.  R. 286-94.[7]

In a statement signed November 19, 2007, Hedrych stated that Ligon could lift/carry five pounds infrequently, sit up to two hours at 10-15 minute intervals, stand up to two hours at 10-15 minute intervals and walk up to two hours at 15 minute intervals.  R. 414-23.   He noted that Ligon did not require a cane to walk.  R. 415.   Hedrych stated that Ligon could occasionally use his hands for activities such as reaching, handling, pushing or pulling, but that he could never operate foot controls.  R. 416.  In addition, he noted that Ligon could never climb stairs, ramps or ladders, balance, stoop, kneel, crouch or crawl.  R. 417.  Hedrych noted that Ligon could never be exposed to environmental factors such as unprotected heights, moving mechanical parts, operating a motor vehicle or vibrations, and that he could be exposed only occasionally to humidity and wetness, extreme cold, extreme heat, dust, odors, fumes and pulmonary irritants.  R. 418.  The claimed findings supporting his assessment were that Ligon had a left knee derangement with probable torn meniscus and lumbrosacral derangement with lumbar radiculopathy and spasm spine sprain-strain.  R. 414.

7.  *Dr. Marilee Mescon*

On July 31, 2006, a consultative examination was performed by Dr. Marilee Mescon, who noted in her report that no doctor-patient relationship existed or was implied by the examination.  R. 182-86.  She noted that Ligon did not wear a knee or back brace, but he did use a cane.  R. 182-83.  Ligon's medication was Tylenol No. 3 on an as needed basis.  *Id.*  Ligon

---

[7]         On September 14, 2006, Hedrych was apparently contacted for the purpose of clarifying his residual functional capacity statement.  R. 189.  The writer of the report concluded that Hedrych could not give objective findings to corroborate his diagnosis.  *Id.*  As discussed further below, there has been some confusion regarding the genesis and author of the report.

reported that he could shower, dress and bathe by himself, but that someone else performed the shopping, cooking and cleaning. R. 183. Mescon also noted that Ligon could walk normally without the cane, walk on heels and toes without difficulty, and did not need help changing for the exam, getting on or off the exam table, or rising from the chair. *Id.* She noted diminished sensory perception in his left medial upper leg. R. 184. Her diagnosis was back and left knee pain and hypertension. R. 185. In addition, Mescon stated that there were "no objective findings to support the fact that [Ligon] would be restricted in his capacity to sit or stand for short periods of time, but his capacity to climb, push, pull, or carry heavy objects would probably be mildly to moderately restricted by back and knee pain." *Id.*

C.      *Procedural History*

On May 10, 2006, Ligon applied for SSI benefits claiming that he was disabled due to injuries to his back and knee, sustained as a result of the October 2003 accident. R. 60, 461. His application was denied. R. 18. Ligon then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on November 26, 2007. R. 433-55. ALJ Neil Ross presided over the hearing via videoteleconferencing. R. 459. Ligon was represented by counsel. *Id.* In a decision dated November 30, 2007, ALJ Ross found that Ligon was not disabled because he could perform a significant number of jobs existing in the national economy. R. 456-67.

The ALJ found that Ligon was severely impaired due to herniated lumbar discs and derangement of the left knee, but that this impairment did not meet or medically equal one of the listed impairments in the regulations. *Id.* In finding that Ligon retained the residual functional capacity to perform the physical exertion requirements of work except for lifting or

13

carrying more than 20 pounds, ALJ relied on the Ligon's testimony and the medical evidence submitted.  *Id.*

On February 28, 2008, the Appeals Counsel denied Ligon's request for review, rendering ALJ Ross's decision the final decision of the Commissioner.  R. 4-6.  Ligon filed a complaint in this district on April 14, 2008, alleging that the Commissioner's decision was erroneous and that he was disabled.  The Commissioner now moves for affirmation of his final decision that Ligon is not disabled and therefore is not eligible for benefits.  In a cross-motion, Ligon seeks a reversal of the Commissioner's decision.  Oral argument on the motions was held before me on December 19, 2008.

DISCUSSION

A.      *The Legal Standard*

Under 42 U.S.C. § 405(g), I review the Commissioner's decision to determine whether it was "'supported by substantial evidence in the record as a whole or [was] based on an erroneous legal standard.'"  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)).  In deciding whether the Commissioner's conclusions are supported by substantial evidence, a reviewing court must "first satisfy [itself] that the claimant has had 'a full hearing under the Secretary's regulations and in accordance with the beneficent purpose of the Act.'"  *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (quoting *Gold v. Sec'y of Health, Educ. & Welfare*, 463 F.2d 38, 43 (2d Cir. 1972)).

Under the Social Security Act, Ligon is entitled to SSI benefits if "by reason of [a] medically determinable physical or mental impairment which … has lasted or can be

expected to last for a continuous period of not less than twelve months," 42 U.S.C. §

1382c(a)(3)(A), he "is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy," *id.* at § 1382c(a)(3)(B).  The Commissioner decides whether the

claimant is disabled within the meaning of the Act.  20 C.F.R. § 416.927(e)(1).

      The Social Security Administration's regulations break down the inquiry into a

five-step process:

> First, the Commissioner considers whether the claimant is
> currently engaged in substantial gainful activity.  If he is not, the
> Commissioner next considers whether the claimant has a severe
> impairment which significantly limits his physical or mental ability
> to do basic work activities.  If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed in
> Appendix 1 of the regulations.  If the claimant has such an
> impairment, the Commissioner will consider him disabled without
> considering vocational factors such as age, education, and work
> experience; the Commissioner presumes that a claimant who is
> afflicted with a listed impairment is unable to perform substantial
> gainful activity.  Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's
> severe impairment, he has the residual functional capacity to
> perform his past work.  Finally, if the claimant is unable to perform
> his past work, the Commissioner then determines whether there is
> other work which the claimant could perform.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (internal quotation marks,

brackets and ellipsis omitted); *see also* 20 C.F.R. § 416.920(a)(4) (setting forth this process).

      In making the required determinations, the Commissioner must consider (1) the

objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the

subjective evidence of the claimant's symptoms submitted by the claimant, his family and others;

and (4) the claimant's educational background, age and work experience.  *Carroll v. Sec'y of*

*Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). Further, the ALJ conducting the administrative hearing has an affirmative duty to investigate facts and develop the record where necessary to adequately assess the basis for granting or denying benefits. *See* 20 C.F.R. § 416.1400(b) (expressly providing that the Social Security Administration "conduct the administrative review process in an informal, nonadversary manner"); *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits. . . ."); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). If "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," it is appropriate for a court to reverse an ALJ's decision and order the payment of benefits. *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980).

B.    *The ALJ's Decision*

Applying the five-step sequential evaluation prescribed by 20 C.F.R. § 416.920(a)(4), the ALJ found at step one that Ligon had not engaged in substantial gainful activity since May 10, 2006, the date he filed his application. R. 461. At step two, he found that Ligon's "severe" impairments for the purposes of § 416.920(c) were: herniated lumbar discs at L3-4 and L4-5 and left knee derangement. *Id*. The ALJ found at step three that Ligon's impairment or combination of impairments did not equal the severity of any conditions in the Listings of Impairments contained in Appendix 1 to Subpart P of Part 404 of the Social Security Administration's regulations. R. 464. At step four, the ALJ found that Ligon retained the residual functional capacity ("RFC") to perform work except for that required to lift or carry more than 20 pounds, which rendered him unable to perform his past relevant work as a

maintenance worker, parking coordinator or car transporter.  R. 466.  Finally, at step five, the

ALJ found that Ligon's RFC, considered in connection with his age, education and work

experience, compelled the conclusion that he was not disabled from performing light work, and

that there are jobs that exist in significant numbers in the national economy that he could

perform.  *Id.*

C.	*The ALJ's Evaluation of the Medical Evidence*

1.	*The ALJ's Decision to Discredit Dr. Hedrych's Findings*

Ligon argues that the ALJ erroneously failed to accord controlling weight to the

findings of Dr. Hedrych, his treating physician.  The Commissioner argues that the ALJ properly

declined to accord Hedrych's assessments controlling weight because they were not well-

supported by objective medical evidence and were inconsistent with other evidence of record.

While the final determination as to disability rests with the Commissioner, 20 C.F.R. §

416.927(e)(1), a treating physician's opinion about a claimant's impairments is entitled to

"controlling weight" if it is "well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case

record."  20 C.F.R. § 416.927(d)(2); *see also Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993)

(upholding these regulations).

When the Commissioner does not give a treating physician's opinion controlling

weight, the weight given to that opinion must be determined by: "(i) the frequency of

examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in

support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the

opinion is from a specialist; and (v) other relevant factors."  *Schaal*, 134 F.3d at 503 (citing 20

C.F.R. § 416.927(d)(2)). The Commissioner must set forth "good reasons" for failing to accord the opinions of a treating physician controlling weight. *See, e.g.*, *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians [sic] opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). The ALJ is required to explain the weight given to treating source opinions when they are found not to be controlling, and to provide some explanation for rejecting them. *See Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *see also Heath v. Astrue*, No 07-CV-1238, 2008 WL 1850649, at *2 (E.D.N.Y. Apr. 24, 2008) ("Where there is conflicting evidence on the issue of disability, 'it is for the [Social Security Administration], and not this court, to weigh the conflicting evidence in the record,' particularly when the court 'cannot say with certainty what weight should be assigned ... to the opinion of plaintiff's treating physician.'") (*quoting Schaal*, 134 F.3d at 504 (alterations in original)).

The parties agree that, for the purposes of Ligon's claim, Dr. Hedrych, a trauma specialist, is his most recent treating physician and was treating Ligon when he applied for benefits in 2006. Although Hedrych treated Ligon for over nine months in 2006 and filed a Medical Source Statement of Ability To Do Work Related Activities on Ligon's behalf on November 19, 2007, the ALJ decided not to give his opinions controlling weight. The ALJ found that Hedrych's RFC assessments would not only not be controlling, but could not be accorded "great weight" because (1) during Hedrych's course of treatment Ligon was attempting to obtain Workers' Compensation Benefits and "[t]herefore, Dr. Hedrych's reports would be

expected to support [Ligon's] claim for Worker's [sic] Compensation benefits"; (2) Hedrych ceased treating Ligon after his Workers' Compensation settlement was reached, which "constrained" the ALJ "to find that [Ligon] exaggerated his complaints … in an effort to obtain [such] benefits"; (3) Hedrych's RFC assessments lacked supporting objective clinical findings; and (4) the numerous other physicians who examined Ligon since his alleged onset of disability "are generally consistent and do not reflect any significant physical abnormalities which would preclude the performance of light work."  R. 465.  I conclude that the ALJ did not provide good reasons for not giving Hedrych's opinion controlling weight.  Moreover, he failed even to mention the weight Hedrych's opinion was given (except to say it was not "great"), let alone apply the factors set forth in the regulations that are intended to inform such determinations.

The first two reasons offered by the ALJ both rely on the fact that Ligon was seeking Workers' Compensation benefits at the time he was being treated by Hedrych.  Neither the first rationale (that Hedrych's reports would be expected to support Ligon's Workers' Compensation claim), nor the second (that the cessation of treatment by Hedrych after the Workers' Compensation settlement was evidence that Ligon had exaggerated his claims to obtain Workers' Compensation benefits in the first place) is a "good reason" for not assigning controlling weight to Hedrych's opinions.  A doctor's opinion is not intrinsically suspect because the patient is seeking other benefits.  *See* 20 C.F.R. § 416.927(d)(2).  And there are good reasons why even disabled people cease treatment after a Workers' Compensation settlement, including the fact that the costs of treatment from that point forward must be borne by the claimant.  That apparently was Ligon's reason (R. 449, 454), and the ALJ did not even ask whether Ligon could no longer afford to see his doctor or attend physical therapy sessions.  If he had, he might not

have been "constrained" to conclude Ligon was lying or exaggerating. It was not fair for the ALJ to assume that Ligon's decision not to pay for treatment meant he felt less pain than he claimed. In the absence of an appropriate inquiry into why Ligon ceased his doctor visits and physical therapy treatment, it strikes me as inappropriate to discredit the treating physician's assessment of Ligon's condition.

The ALJ's third rationale (that Hedrych's RFC assessments lacked supporting objective clinical findings[8]) might be a "good reason" but for the conflicting evidence in the record on this score. Evidence in support of medical opinions is of course generally one of the factors that an ALJ may consider when determining the proper weight to give the opinion. *See* 20 C.F.R. § 416.927(d)(3). In support of his decision discounting Hedrych's opinion, the ALJ noted that Hedrych "admitted … to the State Agency disability examiner in September 2006" that there were no objective clinical findings that supported his opinion. R. 465. The record contains no such admission. The Commissioner's brief (at p. 21) cites to R. 189, which is a neither a "State Agency" document nor an admission by Hedrych. Indeed, it appears to be a Social Security Administration document, but the record does not reflect who created it and under what circumstances.

Moreover, Hedrych's records of his consultations with Ligon are replete with evidence in support of his diagnoses and clinical findings regarding functional limitation. Over the course of nine months in 2006, his physical examinations consistently found that Ligon had (1) a markedly antalgic gait[9] with splinted torso, favoring his left lower extremity; (2) a markedly limited heel walking associated with weakness and left lower extremity radicular pain and low

---

[8]     Clinical findings include the results of physical examinations.  20 C.F.R. § 416.913(b)(2).
[9]     An antalgic gait is a limp in which a phase of the gait is shortened on the injured side to alleviate the pain experienced when bearing weight on that side.

back pain and an inability to walk on his toes; (3) a limited range of motion in his spine (*e.g.*, pain with limitation of flexion ranging from 15-45, extension ranging from to 0-5, lateral flexion to the right ranging from 5-10 and left ranging from 10-15); (4) a marked paravertebral muscle spasm; (5) positive straight leg raising; (6) medial joint line tenderness in the knee; (7) decreased sensation over the L4-5, L5-S1 dermatomes, and (8) left quadriceps muscle mass and tone loss. R. 286-300. And there is no dispute that Ligon's records further reveal that he suffered herniated lumbar discs and left knee derangement. All of the foregoing findings support Hedrych's opinion.

Even if the ALJ thought otherwise based on the so-called "State Agency" report, R. 189, he should have inquired further. Under the regulations, when the evidence received from a treating physician is inadequate to determine whether a claimant is disabled, the ALJ "will need additional information to reach a determination or a decision." 20 C.F.R. § 416.912(e). Additional clarifying information is sought "when the report from [a] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Id*. If the ALJ saw a conflict between Hedrych's clinical findings and his opinion that Ligon was disabled, or felt that the report on page 189 of the record undermined that opinion,[10] he should have sought clarification from the treating physician.

The ALJ's fourth reason for failing to give Hedrych's opinion great weight was that the other physicians' reports were "generally consistent and d[id] not reflect any significant

_____

[10] At oral argument, the Commissioner sought leave to supplement the record with regard to the report at page 189 of the administrative record. Both the ALJ and the Commissioner's brief in this court refer to that document as a state agency report, but the document itself bears a Social Security Administration form number. Though I denied the Commissioner's request, he is both free and encouraged to shed further light on that issue on remand.

physical abnormalities which would preclude the performance of light work." R. 465. Whether a medical opinion is consistent with the record as a whole is one of the factors that an ALJ may properly employ when determining the weight to give a physician's findings. While the record reflects that other physicians who evaluated Ligon agreed that he could perform light work,[11] those reports may be less probative of Ligon's claims than Hedrych's. None of those physicians except for Dr. Mescon, who evaluated Ligon only once, and Dr. Blonder (whose medical opinion was not even considered by the ALJ), treated Ligon in the 20 months prior to his hearing. While it is certainly appropriate to consider prior physicians' statements, to give them greater weight than a treating physician's more recent findings without additional explanation amounts to legal error. It is possible, for example, that Ligon's condition deteriorated after he stopped being treated by Drs. Berkowitz, Morgenstern, Khakhar and Zaretsky.

In addition to his failure to provide good reasons for not giving Hedrych's opinion *controlling* weight, the ALJ utterly failed to perform the required task of determining what weight it deserved. As discussed above, an ALJ is required by the regulations to explain the degree of weight a treating source's opinion deserves when it is found not to be controlling, and to consider specified factors in that determination. Here the ALJ failed, for example, to take into account that Hedrych is a trauma specialist, or to consider the frequency of his examinations of Ligon and the length, nature and extent of Ligon's treatment relationship with Hedrych. This failure to determine the appropriate weight to accord Hedrych's opinion constitutes an independent legal error warranting remand. *See Snell*, 177 F.3d at 133 ("Failure to provide

---

[11] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 416.967.

'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand.") (*quoting Schaal*, 134 F.3d at 505); *see also* 20 C.F.R. § 416.927(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

2. *The ALJ's Adverse Credibility Finding Regarding Ligon's Subjective Symptoms of Pain*

In resolving whether a claimant is disabled, the Commissioner must consider subjective evidence of pain or disability testified to by the claimant. *See* 20 C.F.R. § 416.929(a). However, "[s]tatements about a claimant's pain cannot alone establish disability; there must be medical evidence that shows that the claimant has a medically determinable impairment that could reasonably be expected to produce the pain or other symptoms alleged." *Davis v. Massanari*, No. 00 Civ. 4330, 2001 WL 1524495, at *6 (S.D.N.Y. Nov. 29, 2001). In order to assess the scope of any functional limitations resulting from a medically determinable impairment, the Commissioner must evaluate the intensity and persistence of the claimant's subjective symptoms, including pain, considering the claimant's credibility in light of "all of the available evidence." *Id.* (citing 20 C.F.R. § 416.929(c)(1)); *Sarchese v. Barnhart*, No. 01-CV-2172, 2002 WL 1732802, at *7 (E.D.N.Y. July 19, 2002). Indeed, the regulations acknowledge that "[s]ince symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [the ALJ shall] ... carefully consider any other information [that the claimant] may submit about [his] symptoms." 20 C.F.R. § 416.929(c)(3).

Seven factors must be considered in evaluating a claimant's subjective complaints: (1) the individual's daily activities; (2) the location, duration, frequency and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the

symptoms; (4) the type, dosage, effectiveness and side effects of any medication the individual

takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the

individual received or has received for relief of pain or other symptoms; (6) any measures other

than treatment the individual uses or has used to relieve pain or other symptoms (*e.g.,* lying flat

on his or her back, standing for fifteen to twenty minutes every hour, or sleeping on a board); and

(7) any other factors concerning the individual's functional limitations and restrictions due to

pain or other symptoms.  20 C.F.R. § 416.929(c)(3).

Because the ALJ has discretion to evaluate the claimant's credibility in this

regard, "[i]f the ALJ's decision to ignore plaintiff's subjective complaints of pain is supported by

substantial evidence, then this Court must uphold that determination." *Aronis v. Barnhart*, No.

02 Civ. 7660, 2003 WL 22953167, at *7 (S.D.N.Y. Dec. 15, 2003).  However, the ALJ must set

forth his or her reasons for discounting a plaintiff's subjective complaints with "sufficient

specificity to enable [the district court] to decide whether the determination is supported by

substantial evidence." *Miller v. Barnhart*, No. 02 Civ. 2777, 2003 WL 749374, at *7 (S.D.N.Y.

Mar. 4, 2003) (quotations and citation omitted).

Here, the ALJ's determination that Ligon was not credible is not supported by

substantial evidence.  Although the ALJ noted that he "consider[ed] the evidence of record," and

that Ligon's "medically determinable impairments could reasonably be expected to produce the

alleged symptoms," he found Ligon's "statements concerning the intensity, persistence, and

limiting effects of these symptoms … not entirely credible."  R. 465.  In support of his finding,

the ALJ noted that Ligon testified that "he drives, takes public transportation, and accompanies

his brother shopping."  *Id.*  In addition, the ALJ dismissed Ligon's complaints of severe lower

back pain, noting that "during the course of the entire hearing the claimant remained in his seat despite his complaints of back pain." *Id.*

The cited testimony regarding Ligon's ability to engage in daily activities does not support the ALJ's findings. Ligon's actual testimony was that he "very seldom" drives because he is unable to sit for long periods. R. 438. This was consistent with his responses to questions in a disability report dated July 7, 2006, in which Ligon stated that he does not drive because he it causes him too much pain. R. 74. It is true that Ligon stated that he takes public transportation occasionally, but he also testified that he could not take it daily: "[M]y back and my left knee won't allow me to, not every day." R. 449.

The ALJ failed to even make reference to the other factors of which the regulations require consideration in assessing subjective complaints. The ALJ made no mention of the "location, duration, frequency, and intensity" of Ligon's pain except to note that Ligon was not credible because "during the course of the entire hearing the claimant remained in his seat despite his complaints of back pain." R. 465. The hearing only lasted 29 minutes, and since Ligon testified that he could sit for up to an hour and a half, the fact that he did not get out of his chair hardly impeached his credibility. Moreover, approximately halfway through the hearing Ligon testified that he was, at that moment, experiencing pain in his lower back that radiated down to his knee. R. 448.

In addition, the ALJ did not mention Ligon's extensive testimony about his pain symptoms. As a result of his injuries Ligon lays on the floor for at least two to three hours a day to relieve his pain. He has trouble buttoning his shirt. His handwriting has deteriorated to a degree that it is illegible. He sleeps on the floor. He cannot walk more than four blocks without

needing to stop and hold a pole.  His pain intensifies in cold and wet weather, and when he steps down stairs he sometimes loses all feeling in his left leg.  He cannot sit for more than an hour and a half or stand for more than an hour at a time, and he begins to feel pain after sitting for 10 minutes.  Rather than address these complaints, the ALJ merely noted in summary fashion that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence."  R. 464-65.

Instead of addressing the seven factors that must be considered in evaluating a claimant's subjective complaints, the ALJ chose to highlight -- without context -- three of the activities (driving, taking public transportation and shopping with his brother) Ligon mentioned he sometimes was able to do.  But Ligon testified that he could not do any of them on a daily basis.  As such, they are not among the "daily" activities contemplated by the regulations.  In sum, the ALJ's determination that Ligon's subjective complaints should be discredited lacks the requisite substantial evidence in the record.

I am mindful of the fact that "'[i]t is the function of the Commissioner, not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of the witnesses, including the claimant.'"  *Sarchese*, 2002 WL 1732802, at *7 (*quoting Aponte v. Sec'y, Dep't of Health & Human Servs*., 728 F.2d 588, 591 (2d Cir. 1984) (second alteration in original) (quotation omitted)).  I assume that that principle applies even where, as here, the ALJ appears at the hearing only through the miracle of videoconferencing.  However, I conclude that the ALJ did not objectively assess the credibility of Ligon, and his stated justifications for finding Ligon to be "not entirely credible" do not constitute sufficient grounds to discount a claimant's subjective complaints of pain.

## CONCLUSION

For the reasons discussed above, the Commissioner's motion for judgment on the pleadings is denied. Ligon's motion is granted to the extent that the case is remanded for further proceedings consistent with this opinion.

So ordered.


John Gleeson, U.S.D.J.

Dated:     December 23, 2008
           Brooklyn, New York